**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MUHAMAD M. HALAOUI,

    Plaintiff,

v.

Case No:  6:13-cv-1839-Orl-40TBS

RENAISSANCE HOTEL OPERATING COMPANY,

    Defendant.

## ORDER

This cause comes before the Court without oral argument on Defendant's Dispositive Motion for Summary Judgment (Doc. 49), filed November 3, 2014.  Plaintiff responded on November 17, 2014 (Doc. 56) and Defendant replied on December 1, 2014 (Doc. 60).  Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and memoranda of respective counsel, the Court grants summary judgment in favor of Defendant on Counts 1 and 3 of the Complaint and denies Defendant's motion for summary judgment in all other respects.

**I.    BACKGROUND**

Plaintiff, Muhamad Halaoui ("Halaoui"), worked as a valet for Defendant, Renaissance Hotel Operating Company ("Renaissance"), from March 27, 2006 until October 14, 2011.  As a valet, Halaoui was responsible for arranging transportation for hotel guests.  Because Renaissance contracted with a specific taxi company to be the exclusive transportation provider for guests visiting the hotel, Renaissance required all valets to arrange guest transportation through this taxi company.  However, on October 8,

1

2011, Renaissance learned that Halaoui occasionally called third party taxi providers, including Halaoui's father, to arrange transportation for hotel guests in exchange for kickbacks.  Renaissance terminated Halaoui three days later for violating Renaissance's policy regarding transportation providers.

During his employment, Halaoui became acquainted with one of Renaissance's front desk supervisors, Jacqueline Bassett ("Bassett").  Although Renaissance and Bassett maintain that she and Halaoui entered into a consensual sexual relationship, Halaoui alleges that he was sexually harassed by Bassett.  Halaoui states that over the course of approximately nine months, Bassett made sexually explicit comments, requests, and jokes to Halaoui and coerced Halaoui into engaging in sexual acts.  Halaoui states that he informed Renaissance's human resources department of Bassett's sexual harassment on a number of occasions, but that Renaissance did nothing to address the issue.

After his termination, Halaoui filed a charge of discrimination with the Equal Employment Opportunity Commission, claiming, among other things, that he was sexually harassed during his employment with Renaissance and that his termination was retaliation for complaining about Bassett's sexual harassment.  The EEOC issued Halaoui a right to sue and Halaoui thereafter initiated this action by filing a five-count complaint. Halaoui alleges sexual harassment and retaliation claims under the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01–.11.[1]  Halaoui additionally alleges state common law

---

[1] The Court has subject matter jurisdiction; Halaoui is a Florida citizen, Renaissance is a Delaware corporation headquartered in Maryland, and the amount in controversy exceeds the jurisdictional threshold.  *See* 28 U.S.C. §§ 1332(a), (c)(1).

2

claims for Renaissance's negligent retention and negligent supervision of Bassett. Renaissance moves for summary judgment on all counts.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). However, "[t]he court need not consider only the cited materials" and may consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Rather, the non-movant must go beyond the pleadings and "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587.

In determining whether a genuine dispute of material fact exists, the Court must read the record and the evidence presented in the light most favorable to the non-moving party. *See Porter*, 461 F.3d at 1320. Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### III. DISCUSSION

#### A. Halaoui's FCRA Claims

Federal courts sitting in diversity apply the substantive law of the state in which the case arose. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Because this case arose in Florida, the Court applies Florida law. To that end, Florida courts look to federal case law interpreting Title VII of the Civil Rights Act of 1964 in analyzing FCRA claims, as the FCRA is modeled after Title VII and seeks to achieve the same policy goals. *Castleberry v. Edward M. Chadbourne, Inc.*, 810 So. 2d 1028, 1030 n.3 (Fla. Dist. Ct. App. 2002) (per curiam). Like Title VII, the FCRA proscribes employment discrimination based on a number of protected characteristics, including sex. Fla. Stat. § 760.10(1)(a). It is well-settled that the sex discrimination which the FCRA intends to eliminate covers sexual harassment in the workplace that creates a "discriminatorily hostile or abusive environment." *Maldonado v. Publix Supermarkets*, 939 So. 2d 290, 293 (Fla. Dist. Ct. App. 2006) (internal quotation marks omitted).

Also like Title VII, Halaoui must satisfy the *McDonnell Douglas* burden-shifting framework to impose liability under the FCRA for sexual harassment and retaliation. *Valenzuela v. GlobeGround N. Am., LLC*, 18 So. 3d 17, 21–22 (Fla. Dist. Ct. App. 2009).

4

First, Halaoui must establish a prima facie case for each claim by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden of production then shifts to Renaissance to "articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* at 802. Once Renaissance articulates a non-discriminatory reason for the conduct in dispute, the *McDonnell Douglas* burden-shifting framework is satisfied, leaving Halaoui with the ultimate burden to persuade the trier of fact that Renaissance's proffered non-discriminatory explanation is not the true reason for its conduct, but merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 515–17 (1993).

### 1. Counts 1 & 2: Labeling Halaoui's Sexual Harassment Claims

Counts 1 and 2 seek to impose liability against Renaissance under two theories of sexual harassment: hostile work environment and quid pro quo, respectively. It was once true that the "quid pro quo" and "hostile work environment" labels were meaningful to how a court would interpret a sexual harassment claim. However, the United States Supreme Court has since illuminated that the categories "quid pro quo" and "hostile work environment" no longer control the analysis. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998). Although these labels are not completely irrelevant, the more proper inquiry for determining whether an employer is liable for sexual harassment in the workplace is: Did the employee who is claiming that he was sexually harassed suffer a tangible employment action as a result of his acceptance or rejection of the harassment? *See id.* Where the answer to this question is yes, the employee need only show that his harasser was a supervisor to establish a prima facie case for sexual harassment against his employer, as employers are strictly liable for the harassing conduct of supervisors. *See Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004) ("An employer is

liable . . . if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because [he] refused to give in to [her] sexual overtures.").

However, where the employee does not suffer a tangible employment action as a result of his acceptance or rejection of the sexual harassment, the employee must show more in order to establish a prima facie case against his employer.  First, the employee will need to show that he was subjected to sexual harassment that was so severe and pervasive that it created a discriminatorily abusive work environment.  *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).  Second, the employee will need to indicate a basis for holding his employer liable.  *Id.*  For sexual harassment of this type, it does not matter whether the harasser is a supervisor or a coworker.  *Hulsey*, 367 F.3d at 1245.

Therefore, Halaoui's two theories of liability for sexual harassment are more appropriately styled as sexual harassment resulting in a tangible employment action (Count 2) and sexual harassment not resulting in a tangible employment action (Count 1).  *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311–12 (11th Cir. 2001).

### a.   Count 2: Sexual Harassment Resulting in a Tangible Employment Action[2]

Renaissance moves for summary judgment on Count 2, arguing that Halaoui has failed to establish a prima facie case.  In order to establish a prima facie case for sexual harassment resulting in a tangible employment action, Halaoui must show: (1) he was subjected to sexual harassment by a supervisor, (2) he suffered a tangible employment action, and (3) a causal connection exists between the tangible employment action and

---

[2]   For clarity, the Court addresses Counts 1 and 2 in reverse order.

his acceptance or rejection of the supervisor's sexual harassment.[3]

First, Renaissance contests Count 2 on the grounds that there is no genuine dispute that Bassett was never Halaoui's supervisor. (Doc. 49, pp. 17–20). An employee is a supervisor when "she is empowered by the employer to take tangible employment actions against the victim," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, [and] decision[s] causing a significant change in benefits." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439, 2442 (2013) (internal quotation marks omitted). The ability of an employee to take these types of tangible employment actions is usually "readily determined . . . by written documentation." *Id.* at 2443. The fact that an employee's ability to take tangible employment actions is subject to review by other supervisors or by upper-management does not disqualify the employee from being a supervisor. *See Ellerth*, 524 U.S. at 762. Further, an employer may be deemed "to have effectively delegated the power to take tangible employment actions" when it relies on the employee's recommendations to hire, fire, discipline, or cause other significant changes to another employee's benefits. *Vance*, 133 S. Ct. at 2452.

Renaissance shows that Bassett's defining job characteristics do not qualify her as a supervisor. Renaissance's Resident Manager, Gary Rome, testified at his deposition that Bassett had no authority to fire or discipline employees. (Doc. 50-19, 52:1–18).

---

[3] Courts routinely require plaintiffs to show additional elements to state a prima facie case, such as plaintiff's membership in a protected class, that the sexual harassment was unwelcome, and that the sexual harassment was based on the plaintiff's protected trait. *See, e.g.*, *Hulsey*, 367 F.3d at 1244. The Court finds these elements redundant and unnecessary in the sexual harassment context. First, every human being belongs to a protected class in that one is either male or female. Second, sexual harassment is, by definition, unwelcome. Similarly, sexual harassment is necessarily based on one's protected trait: their sex. The Court therefore modifies the prima facie case as stated.

Instead, Mr. Rome describes Bassett's job duties as "supporting the day-to-day operations of the front desk, check-ins, check-outs, customer interactions, supporting associates when needed with customers," and completing daily paperwork. (*Id.* at 17:16–21). Renaissance's Director of Rooms Operations, Erick Vega, echoes this general description of Bassett's duties. (Doc. 50-20, 26:7–9). Moreover, all of Bassett's obligations required oversight and approval by Renaissance's management. (*See id.* at 29:4–8).

Halaoui responds that, although Bassett may have had management above her monitoring or approving her work, she was nevertheless one of Halaoui's supervisors. Mr. Rome classifies Bassett as a "Front Office Supervisor" within Renaissance's hierarchy of management and characterizes Bassett as supervising hourly associates such as Halaoui. (Doc. 50-19, 17:7–18:11). Renaissance provided Bassett with managerial training, including how to respond to reports of sexual harassment from other employees, and states that she held a "leadership" position within the company. (Doc. 50-20, 26:24–27:11; Doc. 56-2, 37:6–38:13). Bassett testified at her deposition that part of her work included scheduling employees (Doc. 56-2, 21:21–23:2), recommending employee discipline (Doc. 50-20, 32:19–33:1, 58:2–21), and conducting annual employee evaluations (*id.* at 18:20–19:9). In fact, Mr. Vega confirms that Bassett was authorized to discipline employees on behalf of management. (Doc. 56-1, 104:19–105:15; *see also* Doc. 56-5 (disciplinary form which Bassett signed on behalf of a manager)).

Bassett also demonstrated her authority to discipline and terminate employees to Halaoui personally. On February 25, 2011, Bassett texted Halaoui informing him that she fired an employee named Ali. (Doc. 50-11, p. 20, *l.* 1478). On another occasion, Basset threatened Halaoui with discipline after he rebuffed her sexual overtures. (*Id.* at p. 30,

8

*ll.* 2080–88) ("I will write you up for everything[.]"). This evidence and testimony could lead a rational jury to conclude that Bassett had authority to take tangible employment actions or that Renaissance effectively delegated such authority to Bassett and relied on her recommendations. *See Vance*, 133 S. Ct. at 2452. Accordingly, a genuine dispute exists as to whether Bassett was Halaoui's supervisor.

Second, Renaissance maintains that there is no genuine dispute that Halaoui never suffered a tangible employment action resulting from his acceptance or rejection of Bassett's sexual harassment. (Doc. 49, pp. 20–22). As stated above, "[a] tangible employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Johnson*, 234 F.3d at 512 (quoting *Ellerth*, 524 U.S. at 761). Changes to an employee's compensation or changes to scheduling where the employee is compensated hourly also constitute tangible employment actions. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Regardless of the tangible employment action taken, however, it must come as a result of the employee's acceptance or rejection of a supervisor's sexual requests. *Id.*

Renaissance states that Basset did not terminate Halaoui, but that Renaissance fired Halaoui upon learning that he had violated the hotel's transportation provider policy. Renaissance argues that there is no evidence showing that Bassett reduced Halaoui's hours or gave him worse shifts because he rejected Bassett's sexual advances. In support, Renaissance points to printouts of Halaoui's hours (Docs. 50-8, 50-9) and the declaration of Renaissance's Director of Human Resources, Gary Clark, who states that Halaoui's hours were always consistent with the hours worked by the hotel's other valets. (Doc. 60-5, ¶¶ 2–5).

Halaoui disagrees, producing text messages from Bassett demonstrating that she would reward him with better shifts and more hours whenever he accepted her sexual requests and punish him with worse shifts and less hours when he refused. (Doc. 50-11, p. 11, *ll.* 814–816, p. 12, 925–935; Doc. 50-13, pp. 19–20, *ll.* 752–765, p. 34, *ll.* 1358–1363).[4] A rational jury could find a correlation between Halaoui's acceptance and rejection of Bassett's sexual demands and the amount and type of hours he was allowed to work, thus resulting in a tangible employment action. For these reasons, a genuine dispute exists as to whether Halaoui suffered a tangible employment action as a result of Bassett's sexual harassment. Summary judgment is therefore inappropriate on Count 2.

> b. **Count 1: Sexual Harassment Not Resulting in a Tangible Employment Action**

Renaissance moves for summary judgment on Count 1, arguing that Halaoui has failed to establish a prima facie. In order to establish a prima facie case for sexual harassment not resulting in a tangible employment action, Halaoui must show: (1) he was subjected to sexual harassment at work, (2) the sexual harassment was severe and pervasive, and (3) a basis for holding Renaissance liable.[5] Renaissance challenges Count 1 on the grounds that there is no genuine dispute Basset's sexual harassment was not sufficiently severe or pervasive. (Doc. 56, pp. 18–22).

Not all sexually harassing conduct is actionable under the FCRA. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The FCRA "is not a 'general civility code,' and 'simple teasing . . . offhand comments, and isolated incidents (unless

---

[4] For example, when Halaoui requested a day off from work, Bassett responded, "That was cute. Hmmm what will I be getting out of it???????" (Doc. 50-11, p. 12, *ll.* 925–935).

[5] *See* footnote 3, *supra*.

extremely serious)' do not constitute a hostile work environment." *See Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 806 (11th Cir. 2012) (per curiam) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Rather, the FCRA only contemplates harassment in the workplace that is so severe and pervasive that it "alter[s] the conditions of the victim's employment." *See Oncale*, 523 U.S. at 81 (internal quotation marks omitted).

Sexual harassment is sufficiently severe and pervasive where it is both subjectively severe and pervasive to the employee and objectively severe and pervasive to a reasonable person in the employee's position. *Johnson*, 234 F.3d at 509. The subjective test is generally satisfied by the employee's testimony or evidence of his conduct. The objective test, however, is fact-intensive, requiring the Court to look at the frequency of the conduct in the workplace, its severity, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the employee's job performance. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999), *cert. denied* 529 U.S. 1068 (2000). Ultimately, courts should look to the totality of the circumstances in determining whether sexual harassment is objectively severe and pervasive. *Id.*

Renaissance contends that Bassett's conduct was neither subjectively severe and pervasive to Halaoui nor objectively severe and pervasive to a reasonable person in Halaoui's position. Renaissance paints Halaoui's sexual relationship with Bassett as consensual. The two would flirt with each other at work, eat out together, and go to basketball games together. (Doc. 50-1, 239:6–18; Doc. 50-22, 140:18–24). Bassett testified at her deposition that she and Halaoui had sex between five and a dozen times over a period of about six months (Doc. 50-22, 141:16–19; *see also* Doc. 50-1, 246:17–

247:18) and Renaissance submits that the voluminous text messages it has produced read as if Bassett and Halaoui pursued each other equally. (*See* Docs. 50-11, 50-12, 50-13). Moreover, Renaissance points to these text messages as showing that the vast majority of the harassing conduct of which Halaoui now complains occurred outside of work.

Halaoui responds that the appearance of mutuality in his relationship with Bassett was a ruse to keep Bassett complacent. At his deposition, Halaoui testified that he had to go to dinner, attend basketball games, and have sex with Bassett or else she would retaliate against him. (Doc. 56-8, 49:6–25). At work, Halaoui states that Bassett would frequently caress his face or arm, rub his body, and grab his buttocks. (*Id.* at 115:11–22, 119:8–18). Halaoui also shows that Bassett would occasionally make sexually-charged remarks and jokes, once making sexual innuendo about enjoying "meat and white sauce . . . referring specifically about genitalia and semen." (*Id.* at 263:7–14). Halaoui's coworker and close friend, Hamza Jasat, confirms that he witnessed Bassett touch Halaoui's body a few times at work and that Bassett occasionally made sexual jokes and comments to Halaoui. (Doc. 56-7, 87:8–88:12). Mr. Jasat also testified that Halaoui would often complain to him about Bassett's behavior and did not like it when Bassett touched him at work. (*Id.* at 88:23–90:14).

While there is sufficient evidence to create a genuine dispute as to Halaoui's subjective perception of his situation with Bassett, the Eleventh Circuit requires much more than the physical contact and tasteless statements put forth by Halaoui to satisfy the objective test. *Compare Guthrie*, 460 F. App'x at 807 (dozens of sexually-charged comments and actions over a period of eleven months were not severe and pervasive), *Micthell v. Pope*, 189 F. App'x 911, 913–14 & n.3 (11th Cir. 2006) (per curiam) (conduct

was insufficiently severe and pervasive where a supervisor tried to kiss the plaintiff, made numerous derogatory comments, reached across her chest, and engaged in sexual "horseplay" throughout her four years of employment), *and Mendoza*, 195 F.3d at 1248 (one instance of groping, occasional ogling, and sexually-charged remarks were not severe and pervasive), *with Hulsey*, 367 F.3d at 1248 (multiple instances of groping, multiple instances of holding the victim down to rub her breasts, numerous propositions for sex at work, and repeated attempts to pull off the employee's pants were severe and pervasive) *and Johnson*, 234 F.3d at 509 (conduct was severe and pervasive where, over the course of four months, coworker forced unwanted massages on the plaintiff and rubbed his crotch against the plaintiff's buttocks on multiple occasions). *See also Willets v. Interstate Hotels, LLC*, 204 F. Supp. 2d 1334, 1337 (M.D. Fla. 2002) (conduct was insufficiently severe and pervasive where a coworker kissed the plaintiff on the neck, grabbed his buttocks, occasionally rubbed his back and shoulders, and on one occasion placed his hand near the plaintiff's crotch).

Here, although Bassett's physical contact with Halaoui at work may have been frequent, the totality of the circumstances clearly indicates that her conduct was neither severe nor pervasive. After their sexual relationship ended, Halaoui continued to remain friends with Bassett, texting her numerous times over the course of his remaining employment. (*See* Doc. 50-11, pp. 37–42, *ll.* 2464–2797).[6] Any sexual remarks and

---

[6] Based on their text messages and Halaoui's deposition testimony, Halaoui and Bassett agreed to end their sexual relationship sometime between late June and early July 2011. (Doc. 50-1, 246:17–247:18). Thereafter, Halaoui and Bassett continued texting each other on almost a daily basis, chatting about topics such as work, school, family, searching for jobs, and general day-to-day happenings. Halaoui and Bassett actually discussed visiting each other if one of them were to find a job in another city. (Doc. 50-11, p. 42, *ll.* 2784–2797).

13

jokes by Bassett were either infrequent or unmemorable, as Halaoui admits that he can only recall the one comment about "meat and white sauce." (Doc. 50-1, 264:1–3). Moreover, Halaoui never once claims to have felt physically threatened or humiliated and admits that his work performance was never impacted in any way by Bassett's conduct. (*Id.* at 106:1–7, 127:7–22). In fact, there appears to be no incidences regarding the quality of Halaoui's work until Renaissance learned that Halaoui was violating the hotel's transportation provider policy. The totality of the workplace conduct Halaoui describes, although inappropriate, falls short of an objectively severe and pervasive level. Accordingly, Halaoui fails to raise a genuine dispute as to whether Bassett's conduct was sufficiently severe and pervasive and the Court will grant summary judgment in favor of Renaissance on Count 1.

### 2. Count 3: Retaliation

Renaissance moves for summary judgment on Halaoui's retaliation claim on the grounds that he cannot establish a prima facie case. In order to establish a prima facie case for retaliation, Halaoui must demonstrate three elements: (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) the adverse employment action was causally related to his protected activity. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).

Renaissance asserts that there is no genuine dispute that there is no causal connection between Halaoui's protected activity and his termination. (Doc. 50, pp. 31–32). In order to show a causal connection, an employee "need only show 'that the protected activity and the adverse action are not completely unrelated.'" *Wideman*, 141 F.3d at 1457 (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). Such a relationship is often demonstrated through circumstantial evidence, such

as the close temporal proximity of the adverse action to the protected conduct or the more favorable treatment of employees who did not engage in the protected activity. *See Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014) (per curiam). Where an employee relies exclusively on the temporal proximity of the adverse action to the protected conduct, the time between the two events must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (internal quotation marks omitted). Indeed, "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the [retaliation claim] fails as a matter of law." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (internal quotation marks omitted). Additionally, an employee's intervening misconduct may "break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (per curiam).

Renaissance contends that no one at the hotel was aware that Halaoui was experiencing sexual harassment; therefore, any adverse employment action could not have been caused by Halaoui's protected activities. (Doc. 50, pp. 31–32). Moreover, Renaissance submits that Halaoui's intervening misconduct—his violation of the hotel's transportation provider policy—destroys any causal connection which may exist. (Doc. 60, p. 8). Halaoui disagrees, relying exclusively on the close temporal proximity of his termination with his complaints to Renaissance's human resources department regarding Bassett's sexual harassment. (Doc. 56, pp. 24–25).

The record evidence demonstrates that Halaoui cannot show a causal connection between his protected activity and subsequent termination. Halaoui testified at his deposition that he complained to Renaissance's Director of Human Resources, Gary

15

Clark, "pretty soon after" Bassett's harassing conduct began in 2010. (Doc. 56-8, 16:11–20). Halaoui testified that he mentioned the harassment to Mr. Clark on other occasions throughout the next year or so and had his last conversation with Mr. Clark about Bassett's conduct around August or September 2011. (*Id.* at 16:11–20, 77:2–11). Halaoui states he was fired "a month or two later." (*Id.* at 77:2–11). However, Halaoui acknowledges that he was terminated because of his violation of the hotel's transportation provider policy and that other valets had been fired for the same reason. (Doc. 50-1, 115:1–10, 177:1–25, 179:2–180:1, 184:13–187:15, 192:2–193:3, 207:3–25). Indeed, Halaoui did not even suggest at his deposition that his termination was related in any way to his complaints about Bassett. Not only is there a substantial delay in the adverse employment action from Halaoui's last protected activity (approximately two months), Halaoui's intervening misconduct breaks any causal connection which may have existed between the two events. Therefore, Halaoui fails to raise a genuine dispute on the issue of causation and the Court will grant summary judgment in favor of Renaissance on Count 3.

  **B.**  **Counts 4 & 5: Negligent Retention and Negligent Supervision**

Renaissance moves for summary judgment on Halaoui's negligent retention and negligent supervision claims on the grounds that those counts fail to state claims for relief. Specifically, Renaissance states that Halaoui's negligence claims are not legally cognizable because they are not founded upon any tort recognized in Florida. (Doc. 50, pp. 34–35).

Florida allows various forms of negligence actions against employers—including negligent retention and negligent supervision—where the employer fails to maintain a safe workplace or fails to take remedial efforts upon learning of unsafe conduct occurring

at work. However, in order to state any negligent retention or negligent supervision claim, the employee must allege "injury resulting from a tort which is recognized under common law." *Scelta v. Delicatessen Support Servs., Inc.*, 57 F. Supp. 2d 1327, 1348 (M.D. Fla. 1999). In the sexual harassment context, an employee fails to state a negligence claim where he bases his claim solely on sexual harassment, as Florida does not recognize sexual harassment as an independent tort. *Id.* Rather, an employee must rely on allegations of another tort (most commonly assault or battery) in order to continue on a negligent retention or negligent supervision claim. *See Pineda v. PRC, LLC*, No. 1:11-CV-20894-JLK, 2011 WL 3022564, at *2 (S.D. Fla. July 22, 2011).

Renaissance takes issue with a portion of Halaoui's deposition testimony in which he agrees that his negligence claims are based on Bassett's sexual harassment. (Doc. 50-1, 267:5–12). From this, Renaissance reads that Halaoui alleges no underlying tort which could form the legal basis of a negligent retention or negligent supervision claim. However, it is clear from the evidence and testimony in the record that Halaoui's sexual harassment claims against Renaissance include Bassett's unwelcome grabbing of his buttocks, caressing of his arms, and rubbing of his back. (Doc. 56-7, 87:8–88:12; Doc. 56-8, 115:11–22, 119:8–18). Because this conduct would constitute battery under Florida law, Halaoui's negligence claims are based on a tort independent of sexual harassment. *See Pineda*, 2011 WL 3022564, at *2 (permitting the employee to proceed on her negligence claims where she alleged that the harasser touched her without her consent). Renaissance is therefore not entitled to summary judgment on this basis.[7]

---

[7] In its reply, Renaissance raises for the first time additional arguments which it believes justify summary judgment in its favor on Halaoui's negligence claims, including that Halaoui's claims for emotional damages are barred by Florida's impact rule. However, because these arguments were not briefed in Renaissance's initial motion, they are

**IV.    CONCLUSION**

For the aforementioned reasons, Defendant's Dispositive Motion for Summary Judgment (Doc. 49) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Defendant's motion for summary judgment is **GRANTED** as to Counts 1 and 3.

2. Defendant's motion for summary judgment is otherwise **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on April 30, 2015.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

---

improper for the Court's consideration.  *Foley v. Wells Fargo Bank, N.A.*, 849 F. Supp. 2d 1345, 1349 & n.2 (S.D. Fla. 2012).